**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 10-61423-CIV-HUCK/BANDSTRA**

GREAT         AMERICAN         FIDELITY
INSURANCE      COMPANY,      an      Ohio
corporation, and  GREAT AMERICAN E&S
INSURANCE      COMPANY,      an      Ohio
corporation,

       Plaintiffs,

vs.

JWR CONSTRUCTION SERVICES, INC.,
a Florida corporation, GULF REFLECTIONS
CONDOMINIUM ASSOCIATION, INC.; et al.,

       Defendants.
_____/

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

     This matter is before the Court on the parties' cross-motions for summary judgment.
Plaintiffs Great American Fidelity Insurance Company and Great American E&S Insurance
Company ("Plaintiffs" or "Great American") seek a declaration under two materially similar
environmental liability insurance policies (the "Policy")[1] issued by Great American, as insurer,
to Defendant JWR Construction Inc. ("JWR"), as insured, that Great American has no duty to
defend nor indemnify JWR in an underlying state court action[2] relating to the use of defective

---

[1] Each policy is entitled "Contracting Services Environmental Liability Insurance Policy."  D.E.
#136-1 and 136-2.  It is undisputed that the two policies contain the same basis policy language.
*See* D.E. #136, p. 6 and D.E. #147 and 154.  While the second policy has fewer endorsements
than the first policy, the parties agree that none of the omitted endorsements are relevant to the
claims made in the underlying state court action.  *See id.*  Accordingly, the Court will treat both
policies together throughout this Order.  It is notable, however, that the express terms of the
policies require that any ultimate finding of coverage implicating more than one policy period
from the same or a related pollution condition shall implicate only the policy in which the first
exposure took place.  *See, e.g.,* D.E. #136, p. 12 at Section VI.H.

[2] The underlying state court action is styled *Gulf Reflections Condominium Association, Inc., et
al. v. JWR Construction Services, Inc. et al.*, IN THE CIRCUIT COURT OF THE TWENTIETH

Chinese drywall in condominium units where JWR, as general contractor, is being sued by the non-JWR Defendants in this action, referred to herein as the Gulf Reflections Plaintiffs (together with JWR, the "Defendants").[3]  *See* D.E. #135.   JWR, on the other hand, seeks summary judgment that Great American has a duty to defend JWR in the underlying state court action.[4] *See* D.E. #138.   The Gulf Reflections Plaintiffs separately seek summary judgment that Great American's Policy provides coverage to JWR for the claims set forth in the underlying state court action.  *See* D.E. #141.   Both JWR and the Gulf Reflections Plaintiffs maintain that the duty to defend is ripe for adjudication in this action, but that the duty to indemnify is premature as it would depend on the outcome of the underlying state court action, which is ongoing.  *See, e.g.*, D.E. #138 at ¶2 and D.E. #155 at p. 9, FN1. Each party has filed its respective response and reply and the cross-motions are thus ripe for adjudication.   On April 3, 2012, this Court heard oral argument on the issues presented in the cross-motions. Since the parties' cross-motions for summary judgment present significantly overlapping issues, the Court will analyze the motions in tandem and decide whether the respective movants are entitled to judgment as a matter of law. For the reasons set forth below, the Court grants summary judgment in favor of the Defendants with respect to the two exclusions discussed herein and denies summary judgment with respect to the Plaintiffs in connection with Great American's duty to defend.   The Court declines to decide at this time whether there is a duty to indemnify as that issue is premature.

---

JUDICIAL CIRCUIT IN AND FOR LEE COUNTY, FLORIDA, Case No: 10-CA-000371.  *See* D.E. #130-1.

[3] The Gulf Reflections Plaintiffs are Gulf Reflections Condominium Association, Inc., Ribello and Joan Bertoni, Gordon and Nancy Boucher, Margaret Ann  Conte, as Trustee under the Margaret A. Conte Revocable Trust, Roland and Charlene Cummins, Architectural Alliance Holdings, Inc., FMY Ventures, LLC, Brian Herbert, Barry and Rebecca Katz, Jay and Nina Kirby, Robert Kirby, Jeff Kroeger, Jo Ellen Mantuo, Ronald Murphy, Gintautas Ramaskeuicius, Richard and Mary Jo Tedeman, Jill While and Labb Investments Inc., individually, and on behalf of all others similarly situated.

[4] JWR also seeks an order for the immediate reimbursement of JWR's defense costs thus far incurred in the underlying suits, and an order establishing continual defense funding by Great American, the prompt award of attorney's fees and costs for this action to JWR pursuant to Section 627.428, Florida Statutes, and a stay of these proceedings until an underlying judgment or settlement has occurred establishing Great American's indemnity and consequential liability. *See* D.E. #138, p. 2-3.  JWR claims that "the duty to defend is the only point at issue in either party's motions for summary judgment."  D.E. #153, p. 4.

## I.  Background[5]

The insured, JWR, is a corporation organized and existing under the laws of the State of Florida.  The Gulf Reflections Plaintiffs own real property located at 11001 Gulf Reflections Drive, Fort Myers, Florida 33908.  JWR was the general contractor for the Gulf Reflections Condominium units.  In June of 2009, JWR began to suspect a problem with the Chinese drywall in the units.   Consequently, JWR notified its insurance agent, Great American, of an occurrence/claim in writing on June 23, 2009 and on July 2, 2009.  On January 27, 2010, the Gulf Reflections Plaintiffs filed the underlying class action complaint against JWR and a number of other defendants in the Circuit Court for Lee County, Florida.  Recently, the complaint in such action (the "TAC" or "underlying complaint") was amended for a third time to add defendants and amend the causes of action plead.  *See* D.E. #130-1.  The Gulf Reflections Plaintiffs, in the underlying complaint, allege that, after they purchased the condominium units in the Gulf Reflections development, they discovered a latent defect with respect to the drywall used to construct the inside of the unit.  *See* TAC ¶31.  This latent defect, they allege, caused monetary damages, including (1) the need to replace the defective drywall with new drywall, (2) damage to other property including ceiling materials, electrical systems, air conditioning, insulation, certain copper and/or brass plumbing components, and studs, (3) damage to personal property including electrical devices, computers, appliances, jewelry, plumbing fixtures and silverware, and (4) the loss of use and enjoyment of the unit as well as additional living expenses while forced to live away from the unit and loss of market value of the unit.  *See* TAC ¶32.

The underlying complaint alleges five causes of action against JWR:  (1) strict liability; (2) negligence; (3) breach of statutory implied warranty; (4) private nuisance; and (5) vicarious liability for the acts of its actual agent, C.A. Steelman, Inc. (the "Installer"). Allegations with respect to each count are reproduced below in pertinent part:

---

[5] The Court notes that in reviewing the cross-motions for summary judgment it views the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party.

## FACTS COMMON TO ALL COUNTS

* * *

23. The Defendant JWR Construction Services, Inc. (hereinafter "General Contractor"), was at all times material hereto, a Florida for profit corporation. At all material times hereto, General Contractor was retained by Developer and/or the owner of the real property directly and acted in the capacity of a general contractor. As such, this general contractor was in the business of constructing a condominium building, retained the services of various subcontractors in order to complete the construction of a condominium building, and ensuring that the building was built reasonably, was built in accordance with the plans, was built with reasonable and non-defective building materials, was built in accordance with the applicable building codes, and pursuant to the contract.

* * *

### A. STRICT LIABILITY AGAINST GENERAL CONTRACTOR

* * *

141. At all material times hereto, Defendant, General Contractor, was in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling units for sale to the general public.

* * *

157.  The defects in the drywall . . . as well as the Defendant, General Contractor, failing to warn of this defect rendered the drywall unreasonably dangerous and  was the direct and proximate cause of damages to the Plaintiffs.

* * *

### B. NEGLIGENCE OF GENERAL CONTRACTOR

* * *

161. At all times material hereto, Defendant owed plaintiffs a duty of reasonable care. Reasonable care being defined as that degree of care which a reasonably careful person would use under like circumstances. Depending on the circumstances, reasonable care could mean doing something that a reasonably careful person would do or not doing something that a reasonably careful person would not do.

162. Defendant breached this duty of reasonable care when [it] failed to reasonably inspect and/or warn of a product that is "inherently dangerous" and/or Defendant breached its duty of reasonable care when it installed defective Chinese drywall, despite the fact that the

Defendant knew, or should have known, of the defective nature of this product, i.e. the smell and/or the abnormal elemental makeup of this product. Further, Defendant breached its duty of reasonable care when it failed to further investigate and test drywall that the defendant knew or should have known had an abnormal smell and that had for the very first time been imported from a foreign country, in this case China, and a product that had no proven track record here in the United States, and which was causing, on some occasions, physical symptoms, i.e. headaches, burning eyes, respiratory problems, sore throat, etc.

\* \* \*

## C. BREACH OF STATUTORY IMPLIED WARRANTY BY GENERAL CONTRACTOR

\* \* \*

166. General Contractor, under F.S. §718.203 and common law, impliedly warranted to the Plaintiffs that each parcel was reasonably fit for its intended purpose and merchantable, and that the Condominium's buildings, improvements and individual units were constructed in accordance with the plans and specifications filed as a matter of public record, the Florida Building Code, other local and national codes, and good design, engineering, supplies, materials, and construction practices.

167. General Contractor breached the aforesaid implied warranties in that the Condominium's buildings, improvements and individual units were not constructed in compliance with the requirements of the Florida Building Code and other local and national codes, in accordance with proper and approved construction plans and specifications and in accordance with good design, engineering, supplies, materials and construction practices.

168. General Contractor constructed the Condominium's buildings, improvements and individual units and caused the buildings, improvements and individual units to be sold to the Plaintiffs with the defects and deficiencies set forth herein.

\* \* \*

## D. PRIVATE NUISANCE AGAINST GENERAL CONTRACTOR

\* \* \*

174. General Contractor used defective drywall to build the home in question. This tortuous or wrongful act or omission by the Defendant has unreasonably interfered, and continues to interfere, with the use and enjoyment of the property and caused potential health problems.

* * *

**E. VICARIOUS LIABILITY OF THE GENERAL CONTRACTOR FOR THE ACTS OF THEIR ACTUAL AGENT**

* * *

183. General Contractor was charged with the responsibility of providing the Plaintiffs with condominium units that were free of defects and met the ordinary and normal standards for a unit of comparable kind and quality.

184. In an attempt to meet this responsibility, General Contractor entered into various contracts with various contractors. One of these contracts was with the Installer, C.A. Steelman Inc. As a result of this contract, (A contract that the Plaintiff has a good faith belief exists but which is not in the possession of the Plaintiff. This contract will be requested in discovery and will be obtained from the Defendant) this Installer became the General Contractor's actual agent. As a result, the General Contractor became vicariously liable for any and all acts of the Installer. *See* TAC.

The Policy's initial coverage provision applicable to the instant case states the following in pertinent part with references to the "Company" meaning Great American:

A.    **COVERAGE A – OCCURRENCE CONTRACTING SERVICES POLLUTION LIABILITY**

The Company will pay on behalf of the INSURED for LOSS, CLEAN-UP COSTS, and related LEGAL EXPENSE because of a POLLUTION CONDITION arising from CONTRACTING SERVICES or COMPLETED OPERATIONS:

1. which the INSURED becomes legally obligated to pay as a result of a CLAIM because of BODILY INJURY, PROPERTY DAMAGE or ENVIRONMENTAL DAMAGE that occurs during the POLICY PERIOD; or

2. if, during the POLICY PERIOD:

a. the POLLUTION CONDITION first begins; and

b. the INSURED first discovers the POLLUTION

CONDITION; and

c. the INSURED first reports the POLLUTION CONDITION
to the Company in writing.  D.E. #136-1, p. 3, Section I.

The Policy's exclusions for "Faulty Workmanship/Own Work" and "Products Liability"
applicable to the instant case state the following in pertinent part:

This Insurance does not apply to any LOSS, CLEAN-UP COSTS, LEGAL EXPENSE or
other coverage afforded under this Policy . . .

6.  **Faulty Workmanship/Own Work**
based upon or arising out of the cost to repair or replace faulty workmanship,
construction, fabrication, installation, assembly or remediation if such faulty
workmanship, construction, fabrication, installation, assembly or remediation was
performed in whole or in part by an INSURED.

17.  **Products Liability**
based upon or arising out of goods or products manufactured, sold, handled, distributed,
altered or repaired by the INSURED or by other trading under the INSURED's name,
including any container thereof, any failure to warn, or any reliance upon a representation
or warranty made at any time with respect thereto.  This exclusion does not apply to such
goods or products while they remain within the legal boundaries of a COVERED
LOCATION.  D.E. #136-1 at p. 8, Section IV.6.  and p. 10, Section IV.17.

The Policy's pertinent defined terms in all capitalized letters relating to the above-cited
provisions are reproduced below in pertinent part:

**E. CLAIM** means a demand, notice or assertion of a legal right alleging liability or
responsibility on the part of the INSURED, arising out of a POLLUTION CONDITION,
and shall include but not be limited to lawsuits, orders, petitions or governmental or
regulatory actions, filed against the INSURED.

**F. CLEAN-UP COSTS** means reasonable and necessary expenses incurred
to investigate, remove, dispose of, abate, contain, treat or neutralize a
POLLUTION CONDITION, including any monitoring and testing costs:

1. to the extent required by Federal, State Local or Provincial Laws, including
but not limited to statutes, rules, ordinances, guidance documents, regulations
and all amendments thereto, including state voluntary cleanup or risk based
corrective action guidance, governing the liability or responsibilities of the
INSURED; or

2. in the absence of items in 1 above, to the extent recommended by a
ENVIRONMENTAL PROFESSIONAL;  with respect to a POLLUTION
CONDITION.

CLEAN-UP COSTS includes REPLACEMENT COSTS and also includes any associated punitive, exemplary or multiplied damages, where insurable by law.

**G. COMPLETED OPERATIONS** means CONTRACTING SERVICES that are completed. COMPLETED OPERATIONS does not include any CONTRACTING SERVICES that have not been completed or have otherwise been abandoned. CONTRACTING SERVICES will be considered completed at the earliest of the following times:

1. when all CONTRACTING SERVICES to be performed under the contract have been completed; or

2. when all CONTRACTING SERVICES to be performed at the JOB SITE have been completed; or

3. when that portion of the CONTRACTING SERVICES has been put to its intended use by any person or entity other than another contractor or subcontractor working on the same project.

CONTRACTING SERVICES that may require further maintenance, service, correction, repair or replacement, but are otherwise complete, shall be deemed completed.

**H. CONTRACTING SERVICES** means any contracting services stated in the Declarations or scheduled as such onto this Policy by an endorsement issued by the Company, performed by or on behalf of the INSURED at a JOB SITE.

**J. ENVIRONMENTAL DAMAGE** means physical injury to soil, surface water or groundwater arising from a POLLUTION CONDITION and resulting in CLEAN-UP COSTS. ENVIRONMENTAL DAMAGE does not include PROPERTY DAMAGE.

\* \* \*

**N. INSURED** means:

1. the FIRST NAMED INSURED, any ADDITIONAL NAMED INSURED,and any present or former director, officer, partner, member, employee, leased or temporary worker thereof, while acting within the scope of his/her duties as such; and

2. any organization or entity in which the FIRST NAMED INSURED has an ownership interest of fifty percent (50%) or more, or otherwise has management control over, as of the inception date of this Policy; and

3. any joint ventures in which the INSURED is named as a co-venturer, but solely with regard to the INSURED's liability arising out of its CONTRACTING SERVICES provided under such joint venture; and

4. solely with regard to Coverage A under this Policy:

When required by written contract INSURED also includes the client for whom the insured performed CONTRACTING SERVICES provided that such contract was signed by the INSURED and such client prior to the date the POLLUTION CONDITION first commenced. However, the client is included as an INSURED under this Policy solely to the extent that the client is found liable based upon CONTRACTING SERVICES negligently performed by and INSURED other than the client. Coverage for such client under this Policy shall not exceed the lesser of the following amounts:

> i. the Limit of Liability required under such written contract; or

> ii. the applicable Coverage A Limit of Liability of this Policy.

**O. JOB SITE** means a location at which CONTRACTING SERVICES are performed. JOB SITE also includes real property rented or leased by the INSURED during the course of performing CONTRACTING SERVICES but only if such real property is utilized in direct support of such CONTRACTING SERVICES. However, JOB SITE does not included any of the following:

> 1. a COVERED LOCATION(S); or

> 2. any location managed, operated, owned or leased by an INSURED or any subsidiary or affiliate of an INSURED; but this subparagraph 2. does not apply to a location that is managed, operated, owned or leased solely by one or more persons or organizations that are INSUREDS only by reason of subparagraph 4. of the definition of INSURED.

**P. LEGAL EXPENSE** means attorneys' fees and other charges and expenses incurred in the investigation, adjustment, defense, or settlement of any CLAIM for LOSS or CLEAN-UP COSTS, or in connection with the payment of any CLEAN-UP COSTS. LEGAL EXPENSE includes the fees and expenses of consultants, expert witnesses, accountants, court reporters, and other vendors, for goods or services in connection with such investigation, adjustment, defense, or settlement, whether incurred by the INSURED, defense counsel, or the Company.

LEGAL EXPENSE does not include salary charges of regular employees or officials of the Company, fees and expenses of supervisory counsel retained by the Company, or the time and expense incurred by the INSURED in assisting in the investigation or resolution of a CLAIM or in connection with CLEAN-UP COSTS, including but not limited to the costs of the INSURED's in-house counsel.

**Q. LOSS** means a monetary judgment , award or settlement of:

> 1. compensatory damages; or

2. punitive, exemplary or multiplied damages, civil fines, penalties and assessments, where insurable by law;

because of BODILY INJURY and/or PROPERTY DAMAGE.

\* \* \*

**U. POLLUTANTS** mean any solid, liquid, gaseous or thermal pollutant, irritant or contaminant, including but not limited to smoke, vapors, odors, soot, fumes, acids, alkalis, toxic chemicals, hazardous substances, petroleum hydrocarbons, waste materials, including medical, infectious and pathological wastes, legionella, electromagnetic fields. MOLD MATTER and low-level radioactive waste and material.

**V. POLLUTION CONDITION** means any one or more of the following:
1. the discharge, dispersal, release, seepage, migration, or escape of POLLUTANTS into or upon land or structures thereupon, the atmosphere, or any watercourse or body of water including groundwater;

2. the illicit abandonment of POLLUTANTS at a COVERED LOCATION(S) provided that such abandonment was committed by a person(s) or entity(ies) other than an INSURED and without any knowledge by a RESPONSIBLE PERSON;

**W. PROPERTY DAMAGE** means:
1. physical injury to or destruction of tangible property of third parties, including persons or organizations that are INSUREDS only by reason of subparagraph 4. of the definition of INSURED, including the resulting loss of use of such property, and including the personal property of such parties; or

2. loss of use of such property that has not been physically Injured or destroyed; or

3. diminution in the value of such property; or

4. natural resource damage which means the physical injury to or destruction of, as well as the assessment of such injury or destruction, including the resulting loss of value of land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act(16 U.S.C. 1801 et. seq.)), any State, Local or Provincial government, any foreign government, any Native American tribe, or, if such resources are subject to a trust restriction or alienation, any member of a Native American Tribe.

caused by a POLLUTION CONDITION. However, PROPERTY DAMAGE does not include CLEAN-UP COSTS or ENVIRONMENTAL DAMAGE.

**X. REPLACEMENT COSTS** means reasonable and necessary costs incurred by the INSURED with the Company's written consent, to repair, restore or replace damaged real or personal property in order to restore the property to the condition it was in prior to being damaged in the course of incurring CLEAN-UP COSTS. REPLACEMENT COSTS shall not exceed the actual cash value of such real or personal property prior to incurring the CLEAN-UP COSTS. For the purposes of this definition, actual cash value means replacement cost reduced by physical depreciation and obsolescence.

## II. Analysis

### A. Standard of Review

Summary judgment is proper only where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is "to pierce the pleadings and assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587(1986) (*quoting* Fed. R. Civ. P. 56 advisory committee's note). In *Celotex Corp. v. Catrett,* the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of the case with respect to which she has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23(1986).

To prevail, the moving party must do one of two things: (1) show that the non-moving party has no evidence to support its case, or (2) present "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (en banc); *Young v. City of Augusta. Ga.*, 59 F.3d 1160, 1170 (11th Cir. 1995). In making this determination, the court must view the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir.1998) (citations and quotations omitted).

If the moving party successfully discharges this initial burden, the burden shifts to the non-moving party to establish, by going beyond the pleadings, that there is a genuine dispute[6] as to facts material to the non-moving party's case. *Young*, 59 F.3d at 1170. The non-moving party must do more than rely solely on its pleadings, and simply show that there is some metaphysical doubt as to the material facts. *Matsushita*, 475 U.S. at 586-87. A genuine dispute of material fact does not exist unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict in its favor. *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 249 (1986); *Ritch v. Robinson-Humphrey Co.*, 142 F.3d 1391, 1393 (11th Cir. 1998); *EEOC v. Amego*, 110 F.3d 135, 143(1st Cir. 1997); *Thornton v. E.I. Du Pont De Nemours and Co., Inc.*, 22 F.3d 284, 288 (11th Cir. 1994). A dispute is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). A dispute is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case. *Anderson*, 477 U.S. at 248; *Allen*, 121 F.3d at 646.

A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough to meet this burden. *Anderson*, 477 U.S. at 252. *See also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment). However, where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a general issue of material fact, then the court should refuse to grant summary judgment." *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

Where the duty of an insurer rests upon the legal effect of the provisions of an insurance policy, the interpretation of the policy is a matter of law for the Court to determine, and is therefore amenable to summary judgment. *National Union Fire Ins. Co. v. Brown*, 787 F. Supp. 1424, 1427 (S.D. Fla. 1991) (citing *Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985)). "With respect to determining an insurer's duty to defend, summary judgment is generally appropriate inasmuch as the construction and effect of a written contract

---

[6] In 2010, Rule 56(a) was amended to replace the word "issue" with the word "dispute" since the latter word "better reflects the focus of a summary judgment determination." The advisory committee noted, however, that the change was non-substantive and that the "standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

are matters of law to be determined by the Court." *Nationwide Mutual Fire Insurance Co. v. Royal*, 588 F. Supp. 2d 1306, 1313 (M.D. Fla. 2008) (citing *Northland Cas. Co. v. HBE Corp.*, 160 F.Supp.2d 1348, 1358 (M.D. Fla. 2001) ("Summary judgment is appropriate in declaratory judgment actions seeking a declaration of coverage when the insurer's duty, if any, rests solely upon the applicability of the insurance policy, the construction and effect of which is a matter of law") (internal citations omitted).

### B. Choice-of-Law

Since subject matter jurisdiction in this case is premised upon diversity grounds, this Court must determine the law applicable to this matter by resort to Florida's choice-of-law rules. *See Adolfo House Distributing Corp. v. Travelers Property and Casualty Ins. Co.*, 165 F. Supp.2d 1332, 1335 (S.D. Fla. 2001) (citing *LaFarge Corp. v Travelers Indem. Co.*, 118 F.3d 1511, 1515 (11th Cir. 1997); *Bituminous Casualty Corp. v Advanced Adhesive Technology, Inc.*, 73 F.3d 335, 337 (11th Cir. 1996). Here, the Policy contains a choice-of-law provision indicating that "[a]ll matters arising hereunder, including questions related to the validity, interpretation, performance and enforcement of this Policy, shall be determined in accordance with the law and practice of the State of New York (not including New York's choice of law rules)." D.E. #136-1 at Section IX.F. It is well-settled that "Florida courts are obligated to enforce choice-of-law provisions unless a showing is made that the law of the chosen forum contravenes strong public policy or that the clause is otherwise unreasonable or unjust." *Gilman + Ciocia, Inc. v. Wetherald*, 885 So.2d 900, 902 (Fla. 4th DCA 2004). No such showing was made and all parties concede that New York law is applicable. Accordingly, this Court will apply New York law to the facts of this case.

### C. Rules Governing the Interpretation of the Policy

Under New York law, "principles generally applicable to contract interpretation apply equally to insurance contracts." *State v. American Mfrs. Mut. Ins. Co.*, 188 A.D.2d 152, 154 (N.Y. App. Div. 3d Dep't 1993). "As a fundamental matter, the objective of contract interpretation is to give effect to the expressed intention of the parties." *Kimmins Indus. Serv. Corp. v. Reliance Ins. Co.*, 19 F.3d 78, 81 (2nd Cir. 1994). "Where the provisions of an insurance contract are clear and unambiguous, they must be enforced as written (internal

citations omitted).” *Rocon Mfg. v. Ferraro*, 199 A.D.2d 999 (N.Y. App. Div. 4th Dep't 1993). “Clear and unambiguous terms should be understood in their plain, ordinary, popular and nontechnical sense, and they should be given the meaning of 'an ordinary business man in applying for insurance and reading the language of the policies when submitted'” (internal citations omitted). *Id.* The ambiguities in an insurance policy are, moreover, to be construed against the insurer, particularly when found in an exclusionary clause” (internal citations omitted). *Ace Wire & Cable Co. v. Aetna Casualty & Surety Co.*, 60 N.Y.2d 390, 398 (N.Y. 1983). “Generally, it is the insured's burden to establish coverage and the insurer's burden to prove the applicability of an exclusion.” *Rhodes v Liberty Mut. Ins. Co.*, 67 A.D.3d 881 (N.Y. App. Div. 2d Dep't 2009); *see also Neuwirth v. Blue Cross & Blue Shield*, 62 N.Y.2d 718 (N.Y. 1984) (“[t]he burden of proving that a claim falls within the exclusions of an insurance policy rests with the insurer” (internal citations omitted)).

D. *The Duty to Defend*

The first question presented in the instant case is whether Great American has a duty to defend JWR in the underlying state court action. New York's highest court, the New York Court of Appeals, in the *Frontier* case, explained the rule as follows:

> The duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint potentially give rise to a covered claim, or where the insurer "has actual knowledge of facts establishing a reasonable possibility of coverage" (*Fitzpatrick v American Honda Motor Co.*, 78 NY2d 61, 65-67 [(N.Y. 1991)]). To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision (*Continental Cas. Co. v Rapid-American Corp.*, 80 NY2d 640, 652; *Allstate Ins. Co. v Zuk*, 78 NY2d 41, 45). If any of the claims against the insured arguably arise from covered events, the insurer is required to defend the entire action (*Seaboard Sur. Co. v Gillette Co.*, 64 NY2d 304, 311). *Frontier Insulation Contrs. v. Merchants Mut. Ins. Co.*, 91 N.Y.2d 169, 175 (N.Y. 1997).

Although earlier versions of the duty to defend test stated that the duty of the insurer to defend the insured rests <u>solely</u> on whether the complaint alleges any facts or grounds which bring the action within the protection purchased” (emphasis added) *Seaboard Surety Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (N.Y. 1984), the more recent version articulated in *Fitzpatrick*

and *Frontier* and their progeny state that "the duty of an insurer to defend its insured arises whenever the allegations within the four corners of the underlying complaint <u>potentially</u> give rise to a covered claim" (emphasis added). *Frontier Insulation Contrs.,* 91 N.Y.2d at 175; *see also FitzPatrick*, 78 N.Y. 2d at 66.     This difference is significant, and, as discussed below, determinative here, because, in addition to showing that the allegations of the underlying complaint are wholly within the relevant exclusion, the current test also requires that Great American show the absence of its actual knowledge of facts establishing a reasonable possibility of coverage and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision. *See Frontier Insulation Contrs.,* 91 N.Y.2d at 175; *FitzPatrick*, 78 N.Y. 2d at 66; *see also Lombardi, Walsh, Wakeman, Harrison, Amodeo & Davenport, P.C. v American Guar. & Liab. Ins. Co., 85 A.D.3d 1291, 1293 (N.Y. App. Div. 3d Dep't 2011)* ("To avoid defending an action, the insurer bears the burden of showing that the claim is not even potentially covered"); *Cont'l Cas. Co. v. Employers Ins. Co. of Wausau*, 2008 NY Slip Op 28393 (N.Y. Sup. Ct. 2008); *rev. on other grounds*, 85 A.D.3d 403 (N.Y.C.A.2 2011) ("a defense must be afforded whenever a complaint's allegations show or even suggest that coverage is reasonably possible under the policy's terms"); *Rhodes,* 67 A.D.3d at 883 ("An insurer can be relieved of its duty to defend only "if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision").   In *FitzPatrick*, the New York Court of Appeals instructed that "where the insurer is attempting to shield itself from responsibility to defend despite actual knowledge that the lawsuit involves a covered event, a wooden application of the 'four corners of the complaint' rule would render the duty to defend narrower than the duty to indemnify – clearly an unacceptable result." *FitzPatrick*, 78 N.Y. 2d at 66.  As discussed below, Great American's argument focuses only on the first part of the *Frontier* test – the four corners of the complaint rule – and ignores the second part – showing there is no potential for, or possibility of, a covered claim – to its detriment.

In the instant case, this Court must consider whether Great American has met its burden to prove the applicability of one of the two exclusions Great American argues precludes coverage:   the "Faulty Workmanship/Own Work" exclusion and the "Products Liability"

exclusion.[7]  Following the rule set forth in *Frontier*, this Court must first compare the allegations contained in the underlying complaint against each of the two exclusions to determine whether Great American has demonstrated that such allegations are wholly within the relevant exclusion. Next, the Court must consider whether Great American has shown an absence of actual knowledge of facts establishing a reasonable possibility of coverage and that there is no possible factual or legal basis upon which Great American may eventually be held obligated to indemnify JWR under any policy provision.[8]

    1.   The Faulty Workmanship/Own Work Exclusion

     The first exclusion in the Policy that Great American argues precludes coverage is the Faulty Workmanship/Own Work exclusion.  This exclusion provides the following, in pertinent part:

> This Insurance does not apply to any LOSS, CLEAN-UP COSTS, LEGAL EXPENSE or other coverage afforded under this Policy . . . [b]ased upon or arising out of the cost to repair or replace faulty workmanship, construction, fabrication, installation, assembly or remediation if such faulty workmanship, construction, fabrication, installation, assembly or remediation was performed in whole or in part by an INSURED (emphasis added). D.E. #136-1 at p. 8, Section IV.6.

Great American claims that "the damages sought in the [underlying state court action] by the Gulf Reflections Plaintiffs in the [underlying complaint], according to the four corners of the [underlying complaint], are based upon or arose out of faulty workmanship, construction and installation performed in whole or in part by JWR which relate to the Chinese drywall."  Great

---

[7] This Court need not analyze whether JWR has met its burden to establish initial coverage because Great American conceded at the oral argument held on April 3, 2012 that JWR is covered under the Policy prior to considering the exclusions.  JWR asserts a claims-made, completed operations claim under the Policy.  Specifically, JWR claims coverage under Coverage A of the Policy, which provides that "[Great American] will pay on behalf of [JWR] for LOSS, CLEAN-UP COSTS, and related LEGAL EXPENSE because of a POLLUTION CONDITION arising from . . . COMPLETED OPERATIONS . . . which [JWR] becomes legally obligated to pay as a result of a CLAIM because of BODILY INJURY, PROPERTY DAMAGE or ENVIRONMENTAL DAMAGE that occurs during the POLICY PERIOD."  D.E. #136, p. 3 at Section I.A.

[8] The *Frontier* test also requires a finding that the exclusions are not subject to other reasonable interpretations.  Since the Court does not find that the exclusions are ambiguous, the Court finds that this prong is satisfied with respect to both exclusions at issue.

American does not claim that the Gulf Reflection Plaintiffs allege faulty "fabrication," "assembly" or "remediation."  D.E. #137, p. 11.

The first part of the *Frontier* test requires Great American to demonstrate that the allegations of the complaint cast the pleadings wholly within the Faulty Workmanship/Own Work exclusion.  Great American seeks to do so by highlighting the following allegations in the underlying complaint utilizing the words "workmanlike," "construct," and "install" along with similar variations (reproduced in pertinent part with emphasis added):

> 23.  The Defendant, JWR Construction Services, Inc. (hereinafter "General Contractor") . . . was in the business of <u>constructing</u> a condominium building, retaining the services of various sub-contractors in order to complete the <u>construction</u> of a condominium building and ensuring that the building was <u>built</u> reasonably, was <u>built</u> in accordance with plans, was <u>built</u> with reasonable and non-defective building materials, was <u>built</u> in accordance with applicable building codes and pursuant to the contract.

> 142.  The drywall, including that <u>installed</u> in the unit of the Plaintiffs was placed by the Defendant, General Contractor, in the stream of commerce.

> 150.  The drywall was also defective because it was sold, <u>installed</u>, delivered, supplied, and/or distributed in the defective condition described above.

> 154.  Plaintiffs were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs, acting as reasonably prudent people discover that the drywall supplied, <u>installed</u>, distributed by General Contractor was defective, as set forth above, or perceived its danger.

> 155.  The drywall supplied, <u>installed</u>, distributed by the Defendant, General Contractor, was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

> 156.  The benefit, if any, of the drywall supplied, <u>installed</u>, distributed by the Defendant, General Contractor, to the Plaintiffs was greatly outweighed by the risk of harm and danger that the drywall created.

> 162.  Defendant breached its duty of reasonable care when it <u>installed</u> defective Chinese drywall . . . . Further, Defendant breached its duty of reasonable care when it <u>failed to further investigate</u> and test drywall that the defendant knew or should have known had an abnormal smell.

> 167.   General Contractor breached the aforesaid implied warranties in that the Condominium's buildings, improvements and individual units were not <u>constructed</u> in compliance with the requirements of the Florida Building Code and other local and national codes, in accordance with proper and approved construction plans and

17

specifications and in accordance with good design, engineering, supplies, materials and construction practices.

168.  General Contractor <u>constructed</u> the Condominium's buildings, improvements and individual units and caused the buildings, improvements and individual units to be sold to the Plaintiffs with the defects and deficiencies set forth herein.

174.  General Contractor used defective drywall to <u>build</u> the home in question . . .

184.  General Contractor entered into contracts with various contractors.  One of these contracts was with the Installer, C.A. Steelman, Inc.  As a result of this contract . . . this Installer became the General Contractor's actual agent.  As a result, the General Contractor became vicariously liable for any and all <u>acts of the Installer</u>.

185.  Pursuant to this contract, the Installer was then obligated to complete the units in a <u>workmanlike</u> manner, to utilize reasonable and non-defective building materials, and to complete the units free from defects.  Included in these duties was the duty to <u>install</u> all of the drywall within the units.

186.  During the operation of <u>constructing</u> the units, the Installer and/or an actual agent of the Installer brought into the units defective materials, more specifically defective drywall.

187.  This defective drywall then caused property damage within the units.

188.  General Contractor is now vicariously liable for the property damages sustained by the Plaintiffs due to the acts of the General Contractor's actual agent, the Installer. D.E. # 130-1.

Great American contends that a cursory review of the verbs, adjectives and gerunds underscored above reveal that the allegations of the Gulf Reflections Plaintiffs fall squarely within the Faulty Workmanship/Own Work exclusion to coverage under the Policy.  *See, e.g.*, D.E. #137, p. 14-15.

JWR and the Gulf Reflection Plaintiffs, in response, argue that the exclusion does not apply for two reasons:  the exclusion is limited to the "cost to repair or replace" JWR's work and thus would not apply to alleged damages that do not arise out of such costs and the exclusion is limited to work performed by JWR and thus would not apply to work performed by a subcontractor.  *See* D.E. #139, 148 and #153.  The Defendants do not directly address Great American's central point that the allegations fall squarely within the Faulty Workmanship/Own Work exclusion.

First, the Defendants argue that "collateral damage to the underlying claimant's personal property cannot in any form or fashion be couched to be included in the cost to repair or replace JWR's construction." D.E. #139, p. 12. *See also* D.E. #148, p. 5. According to JWR, this "alone is enough to cast the 'your work' exclusion aside for purposes to determine the duty to defend [sic]." D.E. #139, p. 12. JWR also concludes that the exclusion does not bar damages based upon "devaluation of lands below construction or clean-up costs." D.E. #153, p. 2. However, as Great American points out, the Defendants fail to consider the language of the exclusion in its entirety. In particular, the Defendants fail to consider the limiting language at the beginning of the exclusion that "[t]his Insurance does not apply to any LOSS, CLEAN-UP COSTS, LEGAL EXPENSE or other coverage afforded under this Policy . . . ." Assuming faulty workmanship, construction or installation by JWR is alleged and proved, were the Court to read the phrase "cost to repair or replace" in its narrowest sense, as the Defendants urge, the Policy would cover all damages except for those relating specifically to the costs to buy and install new drywall. New York courts, however, read the phrase that precedes "the cost to repair or replace" – "based upon or arising out of" the cost to repair or replace – broadly. *Maroney v. New York Cent. Mut. Fire Ins. Co.*, 5 N.Y.3d 467, 472 (N.Y. 2005) ("[t]he words 'arising out of' have 'broader significance . . . and are ordinarily understood to mean originating from, incident to, or having connection with'"). Here, in addition to the costs to repair and replace the drywall, the drywall is allegedly responsible for damages to real property/fixtures (*e.g.,* ceiling materials, electrical systems, and air conditioning), personal property (*e.g.,* computers and jewelry) and a loss in market value of the property. Thus, the costs to repair or replace such faulty workmanship, construction or installation would not be limited to only the drywall, but also to such damages originating from, incident to, or having a connection with the drywall. All damages in the instant case would thus arise out of the costs to repair or replace such faulty workmanship, construction or installation generally. Accordingly, the Court agrees with Great American that the exclusion, if otherwise satisfied, would apply to preclude all coverage afforded under the Policy.

The Defendants next argue that the Faulty Workmanship/Own Work exclusion "would not preclude coverage based on work performed by a subcontractor." D.E. #148. While Defendants cite no New York law on point to support this proposition, they cite two Florida cases where the insurance policies had "own work" exclusions that did not apply to work

"performed on your behalf by a subcontractor." *See Auto-Owners Ins. Co. v. Pozzi Window Co.*, 984 So. 2d 1241 (Fla. 2008); *United States Fire Insurance Co. v. J.S.U.B., Inc.*, 979 So. 2d 871 (Fla. 2007). Great American argues that these policies are distinguishable because the Policy in the instant case "contains no such subcontractor exception." D.E. #150-2, p. 13. The Defendants claim, on the other hand, that the distinction Great American seeks to draw is without legal significance since the exclusion in the instant case effectively parallels the language from the two Florida cases by limiting the exclusion to performance "in whole or part by an INSURED." D.E. #155, p. 8. The question then is whether the term "INSURED" includes JWR's subcontractors.

In interpreting the Policy, this Court must enforce as written clear and unambiguous terms and must construe all ambiguities against Great American. *Rocon Mfg.*, 199 A.D.2d 999; *Ace Wire & Cable Co.,* 60 N.Y.2d 390, 398. While there is no explicit exception for subcontractors in the Policy, "INSURED" is not defined to include subcontractors or others that work on behalf of the INSURED. Had Great American wished to exclude the faulty work of persons acting on JWR's behalf, it could have easily done so by using clear policy language to that effect. In support of this proposition, Defendants cite a persuasive history of this exclusion indicating that earlier examples of the exclusion applied to insured's subcontractors by utilizing the words "by or on behalf of the named insured." *See Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935 N.E.2d 160, 162 (Ind. 2010) (citing *French v. Assurance Co. of Am.*, 448 F.3d 693, 700 (4th Cir. 2006). Over time, contractors were given the option to eliminate this "by or on behalf" language to gain protection against liability found on account of its subcontractor's faulty work. *See id.* That such history traces the exclusion in the context of commercial general liability policies, rather than environmental liability policies, is not relevant. Since the exclusion in the instant case only applies to faulty workmanship, construction or installation performed in whole or in part by an INSURED and does not also exclude coverage for an INSURED's subcontractors, this Court may not supply a "by or on behalf" term into the Policy for Great American. There is no ambiguity in this respect.

Determining that the exclusion does not apply to subcontractors, however, does not answer the question of whether Great American has met its burden of demonstrating that the allegations of the complaint cast the pleadings wholly within the Faulty Workmanship/Own Work exclusion. If such alleged faulty workmanship, construction or installation was performed

"in part" by the INSURED, this would be enough to satisfy the first part of the *Frontier* test. The Court next examines whether the verbs, adjectives and gerunds highlighted by Great American demonstrate that the allegations of the Gulf Reflections Plaintiffs fall squarely within the Faulty Workmanship/Own Work exclusion.

First, the Court examines whether faulty installation by JWR was alleged. Here, Great American concedes that "the Chinese drywall was properly installed by JWR, but, with alleged inherent, latent defective conditions that existed since manufacturing." D.E. #150-2, p. 12. By admitting "there are no allegations that the Chinese drywall was negligently installed" (*id.*), Great American undermines its argument that the use of the term "install" and similar variations in the allegations fall squarely within the Faulty Workmanship/Own Work exclusion. Rather, none of the allegations using the term "install" implicate the exclusion because "faulty" installation by JWR is not alleged. *See* ¶¶142, 150, 154-6, 162, 184, 185. The repeated allegation concerns the proper installation of defective drywall. Thus, to the extent JWR is held liable under any of the Counts in the underlying complaint, Great American has failed to show that any such damages would arise from JWR's faulty installation of the drywall since faulty installation is not alleged.[9]

Next, the Court examines whether faulty construction or faulty workmanship by JWR was alleged. Here, there is no question that construction that does not comply with building codes and other plans is alleged. *See* ¶¶167 and 168. The statute under which it is alleged, however, has no *mens rea* and thus does not depend on fault. *See* F.S. §718.203(2) ("The contractor, and all subcontractors and suppliers, grant to the developer and to the purchaser of each unit implied warranties of fitness as to the work performed or material supplied by them . . . "). Thus, non-compliance and faulty construction/workmanship cannot be equated. Elsewhere, however, there are allegations that could be construed to depend on fault. For example, JWR is alleged to have breached its duty of reasonable care by installing defective Chinese drywall and failing to further investigate or test drywall that the defendant knew or should have known was defective, had an abnormal smell and had no proven track record in the United States. *See* ¶162. While it is not clear that this failure to identify defective materials would amount, if proven, to

---

[9] In fact, at oral argument held on April 3, 2012, Great American acknowledged that it has no basis to believe that JWR, as general contractor, installed the drywall. Rather, Great American acknowledged that a subcontractor – C.A. Steelman, Inc. – actually performed the installation.

faulty construction or workmanship (as opposed to a mere failure to perform), this Court will assume for purposes of this analysis that such allegations, if proven, would implicate this exclusion and satisfy the first part of the *Frontier* test.

The inquiry, however, does not end here. The second part of the *Frontier* test requires Great American to show an absence of actual knowledge of facts establishing a reasonable possibility of coverage and that there is no possible factual or legal basis upon which Great American may eventually be held obligated to indemnify JWR under any policy provision. Great American has the burden of proving that the claims fall within the exclusion. *See Neuwirth v. Blue Cross & Blue Shield*, 62 N.Y.2d 718 (N.Y. 1984)

To meet its burden to prevail on its summary judgment motion, Great American is required to do one of two things: (1) show that JWR has no evidence to support its case, or (2) present affirmative evidence demonstrating that JWR will be unable to prove its case at trial. *See Four Parcels of Real Property*, 941 F.2d at 1437-38; *Young,* 59 F.3d at 1170 (11th Cir. 1995). Great American, however, makes no effort to do so. Rather, Great American relies only on the allegations in the underlying complaint. In fact, at oral argument held on April 3, 2012, Great American acknowledged its position that, in deciding whether Great American has a duty to defend, the Court must limit its inquiry to the allegations within the four corners of the underlying complaint. As discussed above, however, New York law does not limit itself only to the four corners of the underlying complaint. The Court must also consider whether the insurer has actual knowledge that there is a reasonable possibility of coverage and that there is no possible factual or legal basis upon which Great American may eventually be held obligated to indemnify JWR under any policy provision.

Here, Great American acknowledged that it has no basis to believe that JWR installed the drywall. In fact, at oral argument, Great American indicated that C.A. Steelman, Inc., the drywall subcontractor, installed the drywall. Great American thus knows that the exclusion would only apply to preclude coverage if faulty construction or workmanship by JWR is found on account of negligence assuming that a failure to inspect and/or warn that a product is inherently dangerous or a failure to investigate and test the drywall is considered faulty work (rather than a failure to perform work). Since liability for non-compliant construction under the implied warranty count has no *mens rea* and thus does not depend upon fault, a failure to find fault under the negligence count suggests that JWR could have liabilities that are covered by the

Policy and not excluded by the Faulty Workmanship/Own Work exclusion.  Accordingly, a possible factual or legal basis exists whereby Great American could eventually be held obligated to indemnify JWR.  Thus, Great American has failed to show that it is not reasonably possible that it may eventually be held obligated to indemnify JWR in the underlying state court action. Such possibility means that Great American is not relieved of its duty to defend on account of this exclusion.

The Court now turns its attention to whether the Products Liability exclusion relieves Great American of its duty to defend.

### 2.  Products Liability Exclusion

The second exclusion in the Policy that Great American argues precludes coverage is the Products Liability exclusion.  This exclusion provides the following, in pertinent part:

> This Insurance does not apply to any LOSS, CLEAN-UP COSTS, LEGAL EXPENSE or other coverage afforded under this Policy . . . [b]ased upon or arising out of goods or products manufactured, sold, handled, distributed, altered or repaired by the INSURED or by other trading under the INSURED's name, including any container thereof, any failure to warn, or any reliance upon a representation or warranty made at any time with respect thereto.  This exclusion does not apply to such goods or products while they remain within the legal boundaries of a COVERED LOCATION (emphasis added).  D.E. #136-1 at p. 10, Section IV.17.

Great American claims that "the damages sought in the [underlying state court action] by the Gulf Reflections Plaintiffs in the [underlying complaint], according to the four corners of the [underlying complaint], are based upon or arose out of goods or products – Chinese drywall – which were allegedly sold, handled or distributed by JWR to the Gulf Reflections Plaintiffs. Great American does not rest any arguments, in its summary judgment motion, on the notion that JWR "manufactured," "altered," or "repaired" any good or products.[10]  In addition, at oral argument on April 3, 2012, Great American claimed that the condominium units themselves containing the allegedly defective drywall were equally alleged to be "products" within the Product Liability exclusion.

---

[10] Great American conceded actual knowledge in the hearing held on April 3, 2012 that JWR did not manufacture or distribute the drywall.  Although the Gulf Reflections Plaintiff's allegations refer to JWR's "defective manufacturing," (*see* ¶152), Great American does not seek summary judgment with respect to the Products Liability exclusion based upon such allegation.

To argue that the allegations of the underlying complaint are within the Products Liability exclusion, Great American highlights the following allegations from the underlying complaint utilizing the words "sold," "distribute," "install," "market," "deliver", "supply," and "manufacture" along with similar variations (reproduced in pertinent part with emphasis added):

141.  At all times material hereto, Defendant, General Contractor, was in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling units for sale to the general public.

142.  The drywall, including that installed in the unit of the Plaintiffs was placed by the Defendant, General Contractor, in the stream of commerce.

145.  When installed in the unit, the drywall was in substantially the same condition it was when Defendant, General Contractor, sold, and/or delivered it.

148.  The drywall supplied by the General Contractor was defectively manufactured, designed, inspected, tested, marketed, distributed and sold.

150.  The drywall was also defective because it was sold, installed, delivered, supplied, and/or distributed in the defective condition described above.

152.  General Contractor's defective manufacturing, designing, inspecting, testing, marketing, distributing and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs.

154.  Plaintiffs were unaware of the unreasonably dangerous propensities and defective condition of the drywall, nor could Plaintiffs, acting as reasonably prudent people discover that the drywall supplied, installed, distributed by General Contractor was defective, as set forth above, or perceived its danger.

155.  The drywall supplied, installed, distributed by the Defendant, General Contractor, was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

156.  The benefit, if any, of the drywall supplied, installed, distributed by the Defendant, General Contractor, to the Plaintiffs was greatly outweighed by the risk of harm and danger that the drywall created.

162.  Defendant breached its duty of reasonable care when it installed defective Chinese drywall . . . . Further, Defendant breached its duty of reasonable care when it failed to further investigate and test drywall that the defendant knew or should have known had an abnormal smell.

174.  General Contractor used defective drywall to build the home in question . . .

179.   Defendant's acts and omissions in <u>selling</u>, <u>distributing</u>, and/or <u>delivering</u> the defective drywall was not reasonably[sic] under the circumstances.[11]

Great American contends that a cursory review of the verbs, adjectives and gerunds underscored above reveal that the allegations of the Gulf Reflections Plaintiffs fall squarely within the Products Liability exclusion to coverage under the Policy.  *See, e.g.,* D.E. #137, p. 14-15.

JWR and the Gulf Reflection Plaintiffs, in response, first argue that the exclusion does not apply because building construction is not a "product" under New York law.  In essence, this would mean that any allegation treating the condominium units themselves, as opposed to only the drywall, as the defective product (*see, e.g.,* ¶¶141, 142, and 145) would fall outside of the Products Liability exclusion.   The Defendants do not argue that the drywall, prior to incorporation into the units of real estate, is not a product.  Second, the Defendants argue, in essence, and Great American does not demonstrate otherwise, that if the drywall is considered a product, JWR did not sell, distribute or handle the drywall because JWR "does not trade or deal in drywall."  *See* D.E. #139, 148 and #153.[12]

With respect to the first part of the *Frontier* test, and assuming for purposes of argument that either the units of real estate or the drywall constitute a "product," there is no question that Great American has demonstrated that the allegations of the underlying complaint cast the pleadings wholly within the Products Liability exclusion.

Great American, however, again offers no argument with respect to the second part of the *Frontier* test – showing that it has an absence of actual knowledge of a reasonable possibility of

---

[11] It is worth noting that in the underlying "cookie-cutter" complaint, similar allegations to those made against JWR are made against all of the other defendants, including the developer (Pine Ridge Real Estate Enterprises LLC), the drywall seller/suppliers (Banner Supply Co., Banner Supply Co. Fort Meyers LLC and Banner Supply International LLC), the drywall seller/distributors (La Suprema Trading Inc. and La Supreme Enterprise Inc.) and the drywall installer (C.A. Steelman, Inc.).

[12] JWR also repeats facets of the "cost to repair or replace" argument recited above under the Faulty Workmanship/Own Work exclusion section for the proposition that property damage other than to the condominium units themselves such as personal property damages and diminution of the value of real property are outside of the Products Liability exclusion.  See D.E. #139, p. 11.  As discussed above, however, the plain language of the Policy would exclude all coverage if the exclusion is satisfied.

coverage and that there is no possible factual or legal basis upon which Great American may eventually be held obligated to indemnify JWR under any policy provision.

Here, whether or not the Court considers the condominium units or the drywall to be products, there are no facts to suggest that JWR sold or distributed either.[13]  In fact, Great American conceded at oral argument, in accordance with the allegations in the underlying complaint, that the units were sold by the developer (Pine Ridge Real Estate Enterprises LLC) and the drywall was sold and distributed by other non-JWR parties such as Banner Supply Company.[14]  The Court finds that JWR acted as a general contractor whose business entailed the performance of a service, not the sale of a product.  *See Johnson v. National Union Fire Insurance Company of Pittsburgh, Pa.*, 56 Misc. 2d 983, 988 (N.Y.S. 1968), aff. 309 N.Y.S.2d 110 (N.Y.A.D.2 1970) ("[general contractor] clearly was performing a service and not selling a product").  JWR's Policy, whose title includes the descriptive words "Contracting Services," moreover, makes clear that the intended coverage was for "contracting services" which the Policy defines as general contracting.  *See* D.E. #136-1, p. 5, Section II.H referencing the Declarations on p. 2.  The Products Liability exclusion, on its face, applies only to goods and

---

[13] The Court notes that, under New York law, real estate and building construction are not typically found to be "products" in the case of third-party tort liability claims.  See *Johnson v. National Union Fire Insurance Company of Pittsburgh, Pa.*, 56 Misc. 2d 983, 989 (N.Y.S. 1968), aff. 309 N.Y.S.2d 110 (N.Y.A.D.2 1970) ("Though houses built constitute part of the gross national 'product' and in the broad sense of the word are the 'product' of the labor of the various trades engaged in their construction, they are not 'products' in common parlance.  Rather they are real estate transfers or building construction, while in common parlance the word 'products' means manufactured goods, chattels").  In *J.G.A. Constr. Corp. v. Charter Oak Fire Ins. Co.*, 66 A.D.2d 315 (N.Y. App. Div. 4th Dep't 1979), however, the New York Appellate Division distinguished *Johnson* on the basis that the *Johnson* court was construing language "in cases involving injuries to third persons from the insured's defective workmanship."  There, the *J.G.A. Constr. Corp.* court found, based on "a literal reading of the policy language, the buildings of these projects [were] the plaintiff's 'product', for it constructed them."  In addition, the Court finds that an ordinary businessman would not understand the condominium units to be "products" as contemplated under the Policy's Products Liability exclusion, but would understand the drywall, prior to its incorporation in the units, to be products.  Nonetheless, it is not necessary for the Court to resolve this issue in order to resolve the cross-motions at hand.

[14] *See* TAC ¶22 ("Developer was in the business of . . . entering into a contract for the sale of these condominium units to consumers"); TAC ¶25 ("Supplier acted in the capacity of seller of the drywall"); TAC ¶28 ("Distributor 1 acted in the capacity of the distributor of the drywall").  It is undisputed that JWR did not manufacture the drywall.

products.  An ordinary businessman would thus not understand this exclusion to extend to actions arising out of JWR's contracting services.  Great American would have to show that the finished condominium units were sold or distributed by JWR, which it has not done.[15] Moreover, in acknowledging that others sold and distributed the units and drywall, Great American shows actual knowledge of a reasonable possibility that the exclusion will not apply. Assuming that for purposes of argument that the units and drywall are products, Great American has thus failed to sustain its burden of proving JWR sold or distributed either the units or drywall.

The Court also observed at the hearing that it is more typical for a contractor to buy drywall from a seller or distributor than to be such seller or distributer and Great American agreed.  Great American, having made the concession, argued, however, that JWR nonetheless would have "handled" such drywall since Great American believes "handling" broadly means "having something to do with the drywall."  *Frontier*, and common sense, however, make clear that the term "handled" as used in similar insurance policies is to be construed narrowly and in its commercial connotation:

> To be sure, the term "handled", standing alone, could be construed to refer to any touching of a product in connection with the provision of a service, as defendants contend. However, we conclude that the term's association with the words "manufacturer" and "seller" in the same clause indicates that it should be given its commercial connotation, and construed to refer to products in which the insured <u>trades or deals</u> (*Todd Shipyards Corp. v Turbine Serv*., 674 F2d 401, 420 [5th Cir 1982]). That narrower construction makes practical sense, given that the goal of product-hazards coverage is to insure the party who is responsible for sending goods into the stream of commerce (*Henderson*, op. cit., at 429-430) (emphasis added).  *Frontier Insulation Contrs.,* 91 N.Y.2d at 177.

Great American's proposed broad definition of the term "handled" thus does not accord with New York law.  Since Great American has no basis for arguing that JWR trades or deals in drywall, and concedes that other parties in the underlying action do, Great American fails to sustain its burden of establishing that JWR "handled" the drywall, as that term is properly

---

[15] If, as Great American contended at oral argument, the finished condominium units containing defective drywall are products which were sold JWR, it is clear that those units were neither JWR's products nor products sold by JWR.  As Great American conceded at oral argument, those units were actually sold by the developer, Pine Ridge Real Estate Enterprises LLC.

construed here.   This likewise raises the reasonable possibility that the exclusion will not apply on account of JWR's handling the drywall.

JWR could reasonably be held liable to the Gulf Reflection Plaintiffs in the underlying state court action irrespective of JWR selling, distributing or handling the drywall.  This is because JWR may be held liable for other alleged negligent conduct.  For example, negligence on account of a failure to inspect or warn, as alleged against JWR in the underlying complaint, may be found without a court finding that JWR sold, distributed or handled the drywall.  A duty to inspect a defective product installed by others would be independent of JWR selling, distributing or handling it.  It is notable that, while the Products Liability exclusion has an explicit failure to warn clause, such clause only applies with respect to products manufactured, sold, handled, distributed, altered or repaired by the INSURED.  Thus, if JWR did none of these things yet is held liable for a negligent failure to warn of or inspect the drywall, it would be a liability that is not excluded from the Products Liability exclusion and would thus be covered. Great American cites *United States Fire Ins. Co. v. New York Marine & Gen. Ins. Co.*, 268 A.D.2d 19 (N.Y. App. Div. 1st Dep't 2000) for the proposition that the focus of Court should be directed to the act giving rise to liability – here the installation of defective drywall – as opposed to the theories of liability plead  in determining whether an exclusion to coverage applies.  While the Court acknowledges this rule, the cases Great American cites suggest that it only applies where there is evidence that the plain language of the exclusion is satisfied as to the insured.  For example, in *New York Marine*, the policy contained a broad exclusionary clause applicable to any accident arising out of the ownership, maintenance, operation, or use of a NCBA vehicle. Since the use of a NCBA vehicle as part of the accident was not disputed, the exclusion was applicable based on its plain terms regardless of the theories of liability plead.  *See also New Hampshire Ins. Co. v. Jefferson Ins. Co.*, 213 A.D.2d 325 (N.Y. App. Div. 1st Dep't 1995). Similarly, in *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347 (N.Y. 1996), although negligence was alleged, evidence of criminal assault satisfied the intentional tort exclusion and thus obviated coverage.  The instant case is different because there is no evidence presented that the drywall was sold, distributed or handled by JWR nor does JWR concede that it sold, distributed or handled the drywall.  Establishing even one such excluded act may be enough to foreclose all such coverage.   Great American, however, has not established any such action by JWR. In fact, the evidence is to the contrary.  Thus, relying only the four corners of the

complaint "would render the duty to defend narrower than the duty to indemnify – clearly an unacceptable result." *FitzPatrick*, 78 N.Y. 2d at 66.  Great American therefore has not met its heavy burden of showing that it is not possible that it may eventually be held obligated to indemnify JWR in the underlying state court action.  Such possibility means that Great American is not relieved of its duty to defend.

Since Great American has failed to make a showing sufficient to establish the existence of an element essential to its case for which it bears the burden of proof at trial with respect to both exclusions at issue, summary judgment in Great American's favor is not appropriate with respect to the duty to defend.  *See Celotex Corp*., 477 U.S. at 322-323.  Moreover, since Great American concedes coverage but for the application of the exclusions and the record fails to support the application of the two exclusions discussed herein, summary judgment in favor of the Defendants is warranted relating to the two exclusions on which Great American bases its motion for summary judgment.  This leaves for further determination those exclusions which Great American asserts but which were not the subject of the motion for summary judgment.

### E.  Duty to Indemnify

The second question presented is whether Great American has a duty to indemnify JWR in the underlying state action.  "An unbroken line of cases establishes that an insurer's duty to defend is broader than its duty to indemnify" (internal citations omitted).  *Frontier Insulation Contrs.,* 91 N.Y.2d at 178.  "While the duty to defend is measured against the possibility of recovery, the 'duty to pay is determined by the actual basis for the insured's liability to a third person'" (internal citations omitted).  *Id.*   Since the underlying state court action is ongoing, this Court follows *Frontier* in declining to pass on the question of defendants' duty to indemnify at this early juncture, which predates any ultimate determination of the insurer's liability.  *See id.* at 179.  Accordingly, this Court does not decide at this time whether Great American has a duty to indemnify JWR.

### III. Conclusion

For all of the foregoing reasons, the Court grants summary judgment in favor of the Defendants with respect to the two exclusions discussed herein and denies summary judgment with respect to the Plaintiffs in connection with Great American's duty to defend.  The Court

declines to decide at this time whether there is a duty to indemnify as that issue is premature.  In addition, the Court orders that Great American must immediately reimburse JWR for its defense costs thus far incurred in the underlying suits, establish a continual defense fund to provide for JWR's future defense costs, and pay attorney's fees for this action to JWR pursuant to Section 627.428, Florida Statutes.  Furthermore, these proceedings shall be stayed until an underlying judgment or settlement has occurred.

       DONE in Chambers, Miami, Florida this 9th day of April, 2012.


_____
Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record